**AMERICAN JEWISH CONGRESS,**
Plaintiff,

v.

**CORPORATION FOR NATIONAL AND COMMUNITY SERVICE,**
Defendant,

**University of Notre Dame,**
Defendant–Intervenor.

No. CIV.A. 02–1948(GK).

United States District Court, District of Columbia.

July 2, 2004.

Daniel S. Pariser, Irvin B. Nathan, Arnold & Porter LLP, Washington, DC, for Plaintiff.

W. Scott Simpson, Vesper Mei, U.S. Department of Justice, Washington, DC, for Defendant.

Michael A. Carvin, Jones, Day, Reavis & Pogue, Washington, DC, for Intervenor Defendant.

Anthony R. Picarello, Jr., The Becket Fund For Religious Liberty, Washington, DC, for Amicus.

### MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiff, the American Jewish Congress, brings this action against the Corporation for National and Community Service ("Corporation"). The University of Notre Dame ("Notre Dame") is a Defendant–Intervenor. This matter is now before the Court on three Motions for Summary Judgment filed by Plaintiff, the Corporation, and Notre Dame. Upon consideration of the Motions, Oppositions, Replies, the June 2, 2004 Motions Hearing, and the entire record herein, and for the reasons set forth below, Plaintiff's Motion is **granted**, the Corporation's Motion is **denied**, and Notre Dame's Motion is **denied**.

It is clear from the record in the instant case that the AmeriCorps Education Awards Program ("EAP") being challenged by Plaintiff results in impermissible government indoctrination in violation of

the establishment clause of the First Amendment.

First, it is undisputed that the Ameri-Corps EAP offers program participants a national service education award of $4,725 to work in religious schools where they teach religion to their students throughout the school day, lead their students in prayer multiple times a day, and attend Mass with their students.

The Corporation defends this practice by arguing that the religious instruction undertaken by AmeriCorps participants during the school day is separate from their AmeriCorps service because the time they spend engaging in religious activity is not recorded on the timesheets they submit to justify their $4,725 award. In particular, the Corporation claims that its timekeeping policies ensure that the AmeriCorps participants do not receive public funding for the time they spend in religious activity.

However, the record discloses that the Corporation's monitoring efforts are totally inadequate to ensure that its timekeeping policies are followed. Moreover, even if the Court assumes that the Corporation accurately estimates the time AmeriCorps participants spend on religious versus non-religious activities, it is impossible to clearly distinguish between the two roles the AmeriCorps participants supposedly play. The line between the two has become completely blurred.

Second, it is undisputed that the Corporation does not require faith-based AmeriCorps EAP grantees to account for the actual use of the $400 grants paid for every full-time participant. The Corporation claims that the secular administrative costs of the AmeriCorps EAP are "expect-ed" to exceed the amount of the grant. However, the Corporation's "expectation" that the grantees will spend the direct monetary grants on secular administrative costs—without actually requiring any segregation or accounting for the use of the grants—is not sufficient to render the grants constitutional.

For these reasons, the Court concludes that such direct government involvement with religion "crosses the vague but palpable line between permissible and impermissible government action under the First Amendment." *DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397, 416 (2d Cir.2001).

## I. Background [1]

### A. The Corporation and Its AmeriCorps Education Awards Program

The Corporation administers the National and Community Service Act ("Act"), 42 U.S.C. § 12501, *et seq. See* 42 U.S.C. § 12651. The purpose of the Act is to "meet the unmet human, educational, environmental, and public safety needs of the United States." *Id.*, § 12501(b)(1). The Corporation's "mission" "is to engage Americans of all ages and backgrounds in community-based service" by, among other things, "provid[ing] educational opportunity for those who make a substantial commitment to service." 45 C.F.R. § 2510.10. Corporation funds may not be used "to provide religious instruction, conduct worship services, or engage in any form of proselytization." 42 U.S.C. § 12634(a).

The Corporation funds a wide variety of programs in furtherance of its mission. These programs are designed to "expand educational opportunity by rewarding indi-

---

1. Unless otherwise indicated, all facts set forth herein are taken from the undisputed facts presented in the parties' briefs.

viduals who participate in national service with an increased ability to pursue higher education or job training. . . ." 42 U.S.C. § 12501(b)(3). One such program is the AmeriCorps EAP. In order to "attract participants and encourage service," Def.'s Statement of Facts, ¶ 2, the Corporation offers AmeriCorps EAP participants a full-time national service education award for completing a term of at least 1700 hours of service during a nine- to twelve-month period, in a national service position pre-approved by the Corporation.[2] *See* 42 U.S.C. §§ 12593(b)(1), 12602(a)(1), (b).

The AmeriCorps EAP, like most of the Corporation's programs, is administered through grantees such as state and local governments, Indian tribes, and non-profit organizations, including both secular and faith-based organizations. *See* 42 U.S.C. §§ 12592(a), 12653. The Corporation has offered two pieces of evidence to describe the process it uses to evaluate grantee applications. This evidence presents two very different pictures of what factors the Corporation relies on in making grantee decisions.

According to Hank Oltmann, the Corporation's Senior Program Officer and the Director of the AmeriCorps EAP, the Corporation assesses, among other things, "the extent to which the applicant identifies a compelling need and describes how that need was identified." Oltmann Decl., ¶ 15. To satisfy this requirement, applicants "include data such as position vacancy rates among social service providers, measures of academic underachievement, crime rates, health indicators, and socio-economic indicators such as regional unemployment rates or the percentage of students qualifying for subsidized school lunches." *Id.* Oltmann also explains that "[o]ne of the Corporation's primary criteria in considering applications is 'Budget/Cost Effectiveness.' Each application must describe how the proposed program will be funded, including the use of non-federal sources to support program design." *Id.*, at ¶ 17.

The 2004 AmeriCorps Guidelines, which are far more specific and rigid, include a section titled "Review Process and Selection Criteria."[3] *See* Second Oltmann Decl., Ex. B, at 41. According to the 2004 Guidelines, "Program Design" constitutes 60 percent of the selection criteria; "Organizational Capacity" ("[a]bility to provide sound programmatic and fiscal oversight;" "[s]ound track record of accomplishment as an organization;" "[w]ell-defined roles for staff and administrators;" and "[w]ell-designed plan or systems for self-assessment, evaluation, and continuous improvement") constitutes 25 percent; and "Budget/Cost Effectiveness" ("[c]ommitment of applicant organization or host agency to securing resources, i.e., non-federal support for program implementation or sustainability;" "[a]dequate budget to support program design;" and "[c]ost-effective within program guidelines") constitutes 15 percent. *Id.*, at 41–42.

"Program Design" includes 3 categories: (1) "Needs and Service Activities" ("[w]ell-documented compelling community need;" "[w]ell-designed activities with appropriate performance measures;"

---

2. The current amount of the education award is $4,725. *See* 45 C.F.R. § 2527.10(a). The education award may be used to pay principal or interest on a student loan, to pay college expenses, or to pay expenses of an approved school-to-work program. *See* 42 U.S.C. § 12604(a). The Corporation also pays interest that accrues on a participant's qualifying student loans during his or her term of service. *See* 45 C.F.R. § 2529.10.

3. Each year, the Corporation disseminates AmeriCorps Guidelines to all grantees.

"[w]ell-defined roles for participants that lead to measurable outcomes or impact;" "[p]revious history of accomplishments in the proposed activity areas;" "[e]ffective involvement of target community in planning and implementation;" and "[a]bility to provide or secure effective technical assistance"), *id.*, at 41; (2) "Member Development" ("[e]ffective plans for recruiting, developing, training, supervising, and recognizing participants;" "[w]ell-designed activities that promote an ethic of service and civic responsibility;" and "[w]ell-designed plan to engage participants in high-quality service learning as defined by the Corporation"), *id.;* and (3) "Strengthening Communities" ("[d]eveloping community resources, including recruiting and managing volunteers, with appropriate performance measures;" and "[s]trong community partnerships, including well-defined roles for faith- or community-based organizations;" "[p]otential for sustainability;" "[e]nhanced capacity building of organizations and institutions;" and "[b]ring together people of different backgrounds"). *Id.*

In fiscal years 1999, 2000, and 2001, the Corporation received a total of 153 grant applications, of which 134 were approved. Def.'s Statement of Facts, ¶ 18. In fiscal year 2002, the Corporation received 29 grant applications, of which 20 were approved.[4] *Id.*, ¶ 19. Thus far in fiscal year 2004, there are 34 AmeriCorps EAP grantees. *See* Fifth Olmann Decl., ¶ 3.

Grantees are responsible for recruiting and selecting AmeriCorps EAP participants for their individual programs. *See* Second Oltmann Decl., Ex. B, at 16. *See also* 45 C.F.R. 2522.210. The Corporation has developed and implemented an on-line recruitment system to assist the grantees with this process. *See* Second Oltmann Decl., Ex. B, at 16. This on-line system includes a description of the Corporation's various programs and a list/description of the grantees in each of those programs. It also includes a search engine that allows prospective participants to locate programs based on the service area they are interested in (education, health, homelessness, etc.), geographic location, work schedule, and program type (AmeriCorps*VISTA, EAP, etc.). The Corporation also makes the same information available by telephone. *See* Oltmann Decl., ¶ 6.

At oral argument, the Corporation stressed that an AmeriCorps participant may earn an education award without participating in a grantee program that it has pre-approved. While the Corporation cites to 42 U.S.C. § 12573 [5] in support of

---

4.  Two grantee applicants withdrew their application prior to decision. Def.'s Statement of Facts, ¶ 19.

5.  42 U.S.C. § 12573 states, in full,
    The Corporation may approve of any of the following service positions as an *approved* national service position that includes the national service educational award described in division D of this subchapter as one of the benefits to be provided for successful service in the position:
    (1) A position for a participant in a national service program described in section 12572(a) of this title that receives assistance under subsection (a) or (b) or section 12571 of this title.

    (2) A position for a participant in a program that—
    (A) is carried out by a State, a subdivision of a State, an Indian tribe, a public or private nonprofit organization, an institution of higher education, or a Federal agency; and
    (B) would be eligible to receive assistance under section 12571(a) of this title, based on criteria established by the Corporation, but has not applied for such assistance.
    (3) A position involving service as a VISTA volunteer under title I of the Domestic Volunteer Service Act of 1973 (42 U.S.C. 4951 *et seq.*).

this claim, that section does not appear to allow participation in any but pre-approved programs. In any case, it is clear from the Corporation's representations at oral argument that, regardless of what the statute permits, an AmeriCorps participant must, as a matter of Corporation policy, serve in a grantee program that the Corporation has pre-approved in order to earn an education award.

The only federal funds disbursed in the AmeriCorps EAP are the post-service education awards of $4,725 offered to the individual AmeriCorps participants and the $400 monetary grant provided directly to AmeriCorps EAP grantees for every full-time AmeriCorps participant that they enroll.

### B. Placement of AmeriCorps Participants as Teachers in the Religious Schools of Faith–Based AmeriCorps EAP Grantees

In fiscal year 2001, 565 AmeriCorps participants were placed as teachers in 328 religious schools which were EAP grantees. *Id.*, ¶¶ 66–67. The University of Notre Dame (which maintains a program called the Alliance for Catholic Education

("ACE") and the Catholic Network of Volunteer Service ("CNVS")) are among those faith-based AmeriCorps EAP grantees that place the largest number of AmeriCorps participants as teachers in religious schools.[6]

Pursuant to the Corporation's governing regulations concerning prohibited activities, "[w]hile charging time to the AmeriCorps program, accumulating service or training hours, or otherwise performing activities supported by the AmeriCorps program or the Corporation, ... [AmeriCorps participants] may not engage in ... religious instruction, conducting worship services, providing instruction as part of a program that includes mandatory religious instruction or worship, ... or ... any form of religious proselytization." 45 C.F.R. § 2520.30(a)(7).

This regulation also states that "[i]ndividuals may exercise their rights as private citizens and may participate in [prohibited] activities on their own initiative, on non-AmeriCorps time, and using non-Corporation funds. The AmeriCorps logo should not be worn while doing do." *Id.*, § 2520.30(b). The Corporation construes

---

(4) A position facilitating service-learning in a program described in section 12572(a)(3) of this title that is eligible for assistance under part I of division B of this subchapter.

(5) A position for a participant in the Civilian Community Corps under division E of this subchapter.

(6) A position involving service as a crew leader in a youth corps program or a similar position supporting a national service program that receives an approved national service position.

(7) Such other national service positions as the Corporation considers to be appropriate.

42 U.S.C. § 12573 (emphasis added).

**6.** While Plaintiff named the Nebraska Volunteer Service Commission ("Nebraska Program") as an "AmeriCorps grantee[ ] at issue in this action" in its Complaint, it did not

refer to that program in its briefs or at oral argument except to "reserve the right to seek further discovery of other grantees that place religion teachers in sectarian schools, including the Nebraska Teachers Corps, prior to any trial of this matter." Pls.' Opp'n, at 8, n. 10.

According to the Corporation, of the 34 grantees currently in the AmeriCorps EAP, "the following are faith-based organizations that receive grants directly from the Corporation: (1) University of Notre Dame; (2) Catholic Network of Volunteer Service; (3) Mt. Mary College; (4) Camphill Association of North America; (5) University of San Francisco; and (6) L'Arche USA. In addition, one faith-based organization, Brigham Young University, is a subgrantee of the Utah State Commission on Volunteers." Fifth Oltmann Decl., ¶ 3.

this regulation to permit AmeriCorps participants to teach religion throughout the school day in their placements at religious schools so long as they do not count the hours they spend engaging in such religious activity toward their 1700–hour AmeriCorps minimum service commitment.

The Corporation encourages AmeriCorps participants placed as teachers in religious schools, and the religious schools in which they are placed, to publicize their affiliation with AmeriCorps. Pl.'s Statement of Facts, ¶¶ 70, 73. Ms. Kerry Galea, the Corporation's Site Visit Coordinator, testified that sites are "strongly encouraged to identify with AmeriCorps." Galea Decl., ¶ 31. It is the Corporation's "expectation" that its "Education Awards Programs and members take specific action to create an identity that includes AmeriCorps symbols and networks." Pl.'s Ex. A–2, at C 3347.

The concept of "AmeriCorps Identity," i.e., "the extent to which the provision of AmeriCorps funding is outwardly evident at the site," is one of the specific items that Corporation personnel look for when they conduct site visits at religious schools. Oltmann Decl., ¶ 52. They are also asked to inquire whether the program in question "identif[ies] itself, and ... the members identify themselves, with AmeriCorps, through use of signs, T-shirts, sweatshirts, banners, logos that incorporate the A*C logo." Pl.'s Ex. A–2, at C 3347.

The Corporation requests that "site supervisors" post "an AmeriCorps sign or banner" at the sites where AmeriCorps participants are placed.[7] Specifically, the Corporation requests that sites place these displays "within the vicinity of wherever you[r] member is located, so members of

your staff and service community can identify the member's participation in AmeriCorps." Pl.'s Statement of Facts, ¶¶ 75–76. The Corporation also enables grantees to purchase clothing and other items bearing the AmeriCorps logo, including signs, T-shirts, buttons, and sweatshirts. Id., ¶ 78. The aggregated budgeted amount for such items in the first four years of CNVS' grant from the Corporation was $180,326.75. Id., ¶ 81.

According to a 2002 Corporation site visit report on a CNVS program, there were AmeriCorps signs in each of the classrooms and at the entrances to the religious schools where AmeriCorps participants were placed. Id., ¶ 86. At another CNVS school, the AmeriCorps participants were introduced to students and staff as AmeriCorps participants. Id.

According to the Corporation, AmeriCorps participants placed as teachers in religious schools are expected to wear the same professional attire as other school personnel. In particular, they are instructed not to wear any AmeriCorps gear, such as a T-shirt or cap, at any time while teaching religion or attending any religious function in a school. Def.'s Opp'n to Pl.'s Statement of Facts, ¶ 90.

### 1. The University of Notre Dame's Alliance for Catholic Education Program

The Alliance for Catholic Education ("ACE") program is an AmeriCorps EAP operated by the University of Notre Dame, a private Catholic University located in South Bend, Indiana. According to Dr. John J. Staud, ACE's Administrative Director, ACE had 163 participants during the 2002–2003 school year, approximately

---

7. The typical AmeriCorp sign is a gray, 9″ × 12″ sign with the letter "A" in the middle.

Def.'s Opp'n to Pl.'s Statement of Facts, ¶ 75.

50 percent of whom served as teachers in primary and secondary schools and taught religious subjects. Staud Decl., ¶¶ 10, 15.

One of the "pillars" of the ACE Program is "spirituality." The mission of the ACE teachers is ultimately connected with the larger evangelizing mission of the Catholic Church. Pl.'s Statement of Facts, ¶ 37.

The ACE program includes a "summer program" designed to prepare ACE participants for their placements as teachers. During this summer program, ACE offers prayer services—specifically Catholic Mass—four times a week. At the beginning of this summer program, a retreat is held. Prayer experiences, including Masses and morning prayer, are offered at the retreat. A series of additional retreats are held during the ACE program as part of a "12-step program" designed "[t]o harness and more effectively embody and communicate the key themes related to Christ Teacher." *Id.,* ¶¶ 46–48.

Some of the courses that are taught during the summer program have religious content, and some of these courses are mandatory for ACE AmeriCorps teachers. One such mandatory class, titled the "Integrative Seminar," includes a lecture on "becoming educators in faith, leading others in prayer and forming prayerful communities in Catholic schools." *Id.,* ¶ 51. The Summer 2001 course syllabus for this class included such topics as "To Teach as Jesus Did: The Catholic Educator's Call to be the Love of God on Earth" and "Becoming Educators in Faith: Catechesis in Catholic Schools." *Id.* Another mandatory class is EDU 502, an introduction to teaching. According to the syllabus from one year of that class, "[i]t is absolutely essential that members of ACE have some familiarity with the Catechism of the Catholic Church." *Id.,* ¶ 52.

All ACE teachers live in "intentional Christian communities" of 4 to 7 people which are meant to foster Christian beliefs and values. Members of these communities are invited to pray together. When staff members from ACE conduct site visits to these communities, they look for the extent to which the members engage in communal prayer. *Id.,* ¶ 54–56.

ACE has a series of "new teacher performance indicators" that are applied to measure the performance of the teachers in religious schools after the summer program ends. Among the performance indicators are whether the ACE teacher "provides a variety of prayer experiences" and "witnesses as a person of faith and prayer." *Id.,* ¶ 44.

The Corporation maintains that ACE AmeriCorps teachers are "well aware that [it] prohibits providing religious instruction, conducting worship services, or engaging in any form of proselytization as part of AmeriCorps service, and that no such activities may be included in the 1700 hours of service needed to receive a full-time AmeriCorps education award." Def.'s Statement of Facts, ¶ 97.

#### 2. The Catholic Network of Volunteer Service

The Catholic Network of Volunteer Service ("CNVS") is a religious organization composed of a "loose network" of about 209 member organizations, of which approximately 80 percent are Catholic. The other 20 percent are groups affiliated with other Christian denominations. Approximately 30 percent of AmeriCorps participants serving as teachers in religious schools through CNVS member organizations teach religious subjects. Pl.'s Statement of Facts, ¶ 60.

CNVS maintains a "Response Directory," located on the world wide web at *http://www.cnvs.org.* It contains a descrip-

tion of volunteer opportunities that are available through CNVS member organizations, and can be searched electronically by category of service activity. A search for placements conducted by Plaintiff on February 17 and March 1, 2004 disclosed the following: (1) The Franciscan Volunteer Ministry indicated that participants are required to be "[d]ependable and flexible Christian men and women." Pl.'s Reply, at 21. Under "Goal of the Program," the Ministry indicated that it "encourage[s][its] volunteers as lay people to come to full stature in the Catholic Church...." *Id.* (2) The Pacific Alliance for Catholic Education indicated that participants "[m]ust be Catholic." *Id.* (3) Red Cloud Volunteers indicated that participants are required to be "Christian." *Id.* One of the goals of the program is that "[v]olunteers integrate their Christian faith through service to others...." [8] *Id.*

### C. The Corporation's Monitoring of AmeriCorps Participants' Timekeeping and Eligibility for AmeriCorps Education Awards

In applying for an AmeriCorps education award, grantees must execute a set of Corporation-prescribed "Assurances and Certifications," by which the grantee certifies that it will, if awarded a grant, comply with certain stated Corporation requirements, including that it "[w]ill comply with all rules regarding prohibited activities ... and will ensure that no assistance made available by the Corporation will be used

to support any such prohibited activities." Oltmann Decl., ¶ 36, Ex. D.

Each grantee also must enter into a written "site agreement" with each of its host sites. *Id.*, ¶ 40. These agreements set forth "roles and responsibilities to ensure that the grant provisions and program requirements are met." *Id.* Additionally, the Corporation requires grantees to provide formal orientation for new AmeriCorps participants, and identifies the elements that must be included in the orientation. *Id.*, ¶ 39.

Each year, the Corporation disseminates AmeriCorps Guidelines to all grantees. The 2004 AmeriCorps Guidelines "emphasize that grantees are responsible for monitoring the service activities of participants and for the timely and accurate documentation and certification of service hours." Def.'s Statement of Facts, ¶ 31.

AmeriCorps participants must record their service hours on timesheets. Since August 2002, the Corporation has required AmeriCorps participants who are placed as teachers in religious schools to document the specific activities for which they are accumulating service hours toward their 1700 minimum service commitment, such as which subjects they are teaching. Pl.'s Statement of Facts, ¶ 128. AmeriCorps participants submit their timesheets to the grantees in whose programs they are serving, such as ACE and CNVS. The grantees enter the AmeriCorps hours from the timesheets into a web-based reporting system maintained by the Corporation.

---

8. In the Corporation's Opposition to Plaintiff's Statement of Facts, filed on January 29, 2004, the Corporation represented that CNVS was "implementing correcting action" with regard to these organizations. As of June 2, 2004, no changes had been made to the position description posted by Red Cloud Volunteers. As of June 28, 2004, however, the appropriate changes had been made. *See*

CNVS Response Directory *at* http://www.cnvs.org.

At oral argument, the Corporation represented that Red Cloud Volunteers was no longer an AmeriCorps EAP host site. As of June 28, 2004, however, Red Cloud Volunteers was still listed on the CNVS Response Directory as an AmeriCorps EAP host site. *See id.*

The timesheets are not provided to or reviewed by the Corporation prior to the granting of the $4,725 education award. The Corporation reviews the timesheets only during site visits or in the event of an audit.

Upon completing a term of service in the AmeriCorps EAP, each AmeriCorps participant is required to complete an exit form. The first page of the exit form, which is completed by the participant, includes personal information such as his or her name, address, and social security number. It does not include the number of hours of AmeriCorps service he or she has performed. The AmeriCorps participant must sign the first page of the exit form with the understanding that a "knowing and willful false statement on this form can be punished by a fine or imprisonment or both under Section 1001 of Title 18, U.S.C.." *Id.*, ¶ 136. The second page of the exit form, which is completed by the certifying official, provides the number of service hours the participant performed. There is no space for the AmeriCorps participant to sign his or her name to verify the number of hours reported on this page. Neither page of the exit form specifies the particular activities (such as the subject(s) taught) for which the Ameri-Corps participant accumulated service hours.

Since October 2001, the Corporation has also required each AmeriCorps participant who performs service hours as a teacher in a religious school to sign an additional "certification" before receiving an education award. Although that certification states that the service hours reported on the exit form do not "include any religious instruction, worship, or proselytization," Oltmann Decl., ¶ 42, Ex. F, it does not require the signer to acknowledge that any "knowing and willful false statement on this form can be punished by a fine or

imprisonment or both under Section 1001 of Title 18, U.S.C.." Pl.'s Statement of Facts, ¶ 141. It also does not require that the signature be made under penalty of perjury. *Id.* The supervisor at the host site where the AmeriCorps participant performed his or her service must also sign the certification; that signature is also not required to be made under oath or penalty of perjury. The Corporation maintains that it has instructed grantees which place AmeriCorps participants as teachers in religious schools not to submit an exit form for any such participants until their certifications have been completed.

Neither the exit form nor the certification is provided to or reviewed by the Corporation prior to the granting of an education award.

The Corporation conducts site visits in an effort to directly monitor grantees and AmeriCorps participants. In 2001, the Corporation conducted a total of 5 or 6 site visits per year to the 328 religious schools in which AmeriCorps participants were serving as teachers. Prior to the fall of 2002, the Corporation had never visited a religious school at which CNVS member organizations placed AmeriCorps participants as teachers. *Id.*, ¶ 152. In 2002, the Corporation visited 10 grantees and 37 host sites. All site visits to grantees are pre-announced. *Id.*, ¶ 156.

Despite the fact that all site visits are pre-announced, site visit reports have still revealed serious infractions of Corporation policy. *Id.*, ¶ 166. Specifically, site visits have found some AmeriCorps participants recording time engaging in religious activity on their timesheets, and others have been confused over which types of activities may be recorded and which may not. Other site visits have found timesheets that were signed months after the work was completed, or not at all. And some site visits have revealed documents in the

participants' AmeriCorps files which detailed explicit religious missions or requirements associated with their positions with the schools.

In addition to site visits, the Corporation has ongoing telephonic, electronic, and paper communications with EAP grantees that include compliance issues. Def.'s Statement of Facts, ¶ 71. The Corporation also assigns a program officer to oversee each grantee and conducts monthly conference calls with grantees to discuss program operations. *Id.,* ¶¶ 72, 73.

Plaintiff cites four individual Ameri-Corps participants as examples of problems in the administration of the Ameri-Corps EAP.

AmeriCorps participants Kelly Stolz and Jennifer B'Oris were placed in religious schools in Boston, Massachusetts during the 2002–2003 school year through the Urban Catholic Teacher Corps, a CNVS member organization. The Urban Catholic Teacher Corps' "Handbook for Community Living" for 2002–2003 stated that "Corps members are expected to attend weekly Mass," and that "[p]rayer and sharing the stories of God's action daily life are the foundation of the Urban Catholic Teacher Corps.... [T]hus, Corps members must establish a regular day and time for weekly prayer and faith sharing." Pl.'s Statement of Facts, at ¶ 93. The mission statement of the school where Ms. Stolz was placed stated that "[t]o Preach the Gospel as Jesus did" is one of the "threefold aim[s]" of the school. *Id.,* at ¶ 94.

Ms. Stolz testified that she integrated her religious instruction throughout the school day and led her pre-kindergarten students in prayer four times a day. *Id.,* ¶ 97. Ms. B'Oris taught a third-grade

class and similarly taught religion, including a 30–minute period of direct religious instruction; she also led her students in prayer 3 times a day. *Id.,* ¶ 101–02. Both Ms. Stolz and Ms. B'Oris attended Mass with their students. Religious symbols were visible in both teachers' classrooms, including items such as crucifixes, statutes of Mary, and the Hail Mary prayer written on posters. *Id.,* ¶ 99–103. An AmeriCorps sign was posted in both teachers' classrooms and at the entrance of the schools where they taught. *Id.,* ¶ 100, 104.

AmeriCorps participant Mary–Colleen Duggan was placed by ACE at a religious school in Baton Rouge, Louisiana during both the 1999–2000 and the 2000–2001 school years. In her first year, Ms. Duggan taught only religion; she also led her students in prayer at the beginning of each class, as the school required her to do. Ms. Duggan reported to the Corporation that she performed more than 1700 hours of AmeriCorps service and she earned the $4,725 education award. *See id.,* ¶¶ 106–109. According to the Corporation, Ms. Duggan "fulfilled her AmeriCorps requirements through supervision of extracurricular activities." Def.'s Opp'n, at 14.

AmeriCorps participant Cynthia Ihm Lasage was placed in a religious school in New York during the 1997–1998 school year through the Vincentian Service Corps ("VSC").[9] VSC's mission statement during the relevant time period stated, "Responding to the call of the gospel, in the spirit of St. Vincent de Paul, lay women and men of the Vincentian Service Corps serve those who are poor, while growing in prayer and living simply in community." Pl.'s Statement of Facts, ¶ 119. Ms. La-

---

9. Plaintiff claims that at the time Ms. Lasage was an AmeriCorps participant, the VSC was administered by the CNVS. According to the Corporation, during the relevant time period, the VSC was administered by the National Council of Churches. *See* Def.'s Opp'n to Pl.'s Statement of Facts, ¶ 119.

sage taught 3 religion courses each day to students in the sixth, seventh, and eighth grades. She also attended Mass and prayed with her students.

When Ms. Lasage completed her service, she wrote a letter to the Corporation which stated that her position "was that of a religious educator." *Id.*, at 124. The letter also stated that "[m]ostly I taught the students to adhere to values as defined by the Judeo–Christian religion on which this country is founded." *Id.* Ms. Lasage's letter expressed concern as to whether, given her role as a religious educator, she should be entitled to her AmeriCorps education award. The Corporation granted Ms. Lasage the $4,725 education award after it reviewed her service activities and she provided a second certification. Def.'s Opp'n to Pl.'s Statement of Facts, ¶ 126.

The Corporation does not dispute that AmeriCorps participants, "on their own time," teach classes in religion, or participate in other religious activities. The Corporation categorically denies that any of the four individuals cited by Plaintiff received an education award for hours that included time spent in religious activities.[10]

### D. Direct Monetary Grants to Faith–Based AmeriCorps EAP Grantees

Each grantee in the AmeriCorps EAP receives a monetary grant from the Corporation of up to $400 per year for every full-time AmeriCorps participant that it enrolls. While the Corporation provides these grants "to assist with program-management costs," *id.*, ¶ 207, it "does not require grantees to account for the uses of these funds" because it claims that "the legitimate needs of administering the program, at the grantee level and below, are

expected to exceed the amount of the $400 grants." Oltmann Decl., ¶ 12. The Corporation points out that "the grantees referred to in the complaint affirmatively attest that no portion of the [ ] grants is used for religious activities." Def.'s Opp'n, at 42.

The ACE deposits these grants into a restricted account and uses them to help pay the salaries of the faculty members who teach secular subjects. Staud Decl., ¶ 12. These funds cover approximately 8 percent of the faculty members' salaries. *Id.*

The CNVS does not segregate these funds into a separate account; rather, it deposits all of the funding it receives into a single, general checking account. CNVS shares $120 of each $400 grant with its member organizations. According to James G. Lindsay, Executive Director of the CNVS, "[a]t the CNVS level, the[ ] funds are used for management costs, including program staff salaries, training, supplies, postage, conference fees, and technical assistance." Lindsay Decl., ¶ 11. CNVS's member organizations use their $120 portion "to cover management costs, including program staff salaries, monitoring, reporting, training, supplies, and postage." *Id.*, ¶ 12.

### E. Procedural History

Plaintiff filed the instant action in October 2002. Plaintiff seeks

a judicial declaration that it is contrary to law (1) for the Corporation to approve or qualify the ACE Program, CNVS Program, and Nebraska Program, and any other similar AmeriCorps program, to place AmeriCorps participants as reli-

---

**10.** According to the Corporation, Ms. Duggan is the only AmeriCorps participant who taught only religion. Def.'s Statement of Facts, ¶ 107. The Corporation contends that

Notre Dame has since changed its policy to prohibit AmeriCorps participants from teaching only religion. *See* Def.'s Opp'n, at 14.

gion teachers in private sectarian schools; (2) for the Corporation to provide or administer federal financial assistance, including educational awards, for AmeriCorps participants who teach religion in private sectarian schools; and (3) for the Corporation to fund, directly or indirectly, the religious activities of the ACE Program, CNVS Program, and Nebraska Program, and any other similar AmeriCorps program. Compl., at 14. Plaintiff also seeks "permanent injunctive relief requiring the Corporation to conform its conduct to such judicial declaration." *Id.*

On December 15, 2003, the parties filed the instant three Motions for Summary Judgment.

## II. Standard of Review on a Motion for Summary Judgment

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56. Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548. *See Laningham v. U.S.*

*Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987) (nonmoving party has affirmative duty "to provide evidence that would permit a reasonable jury to find" in its favor); *Crenshaw v. Georgetown Univ.,* 23 F.Supp.2d 11, (D.D.C.1998) (noting that "adverse party must do more than simply 'show that there is some metaphysical doubt as to the material facts' " (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))).

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *See Washington Post Co. v. U.S. Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## III. The Applicable Law for Evaluating Church–State Relations Under the Establishment Clause

■ The Establishment Clause states that "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend. I. The touchstone for evaluating church-state relations under the Establishment Clause is the test enunciated by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), as modified by *Agostini v. Felton,* 521 U.S. 203, 232, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). As originally formulated, the *Lemon* test required that "a statute or practice which

touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion." *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105. In *Agostini,* the Supreme Court modified the *Lemon* test in cases involving school aid, emphasizing the continuing vitality of the first two prongs of *Lemon,* but concluding that *Lemon*'s entanglement inquiry could be considered "as simply one criterion relevant to determining a statute's effect." *Mitchell v. Helms,* 530 U.S. 793, 808, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (Thomas, J., plurality). *See Agostini,* 521 U.S. at 232–33, 117 S.Ct. 1997. Thus, when presented with Establishment Clause challenges, the reviewing court is required to ask " 'whether the government acted with the purpose of advancing or inhibiting religion' and 'whether the aid has the effect of advancing or inhibiting religion.' " *Mitchell,* 530 U.S. at 845, 120 S.Ct. 2530 (O'Connor, J., concurrence) (quoting *Agostini,* 521 U.S. at 222–23, 117 S.Ct. 1997).

Plaintiff concedes that the AmeriCorps EAP was enacted for the valid secular purpose of "expand[ing] educational opportunity by rewarding individuals who participate in national service with an increased ability to pursue higher education or job training. . . ." 42 U.S.C. § 12501(b)(3). Thus, the question presented is whether the AmeriCorps EAP, by (1) placing AmeriCorps participants as teachers in religious schools and allowing them to teach religion to their students throughout the school day, lead their students in prayer multiple times a day, and attend Mass with their students; and by (2) providing monetary grants of up to $400 per year to faith-based AmeriCorps EAP grantees for every full-time AmeriCorps participant the grantees enroll, has the "effect" of advancing religion.

█ In *Agostini,* the Court used "three primary criteria" to evaluate whether government aid has the effect of advancing religion: "(1) whether the aid results in governmental indoctrination, (2) whether the aid program defines its recipients by reference to religion, and (3) whether the aid creates an excessive entanglement between government and religion." *Mitchell,* 530 U.S. at 845, 120 S.Ct. 2530 (O'Connor, J., concurrence). These same factors are used to evaluate whether a government-aid program constitutes an unconstitutional government "endorsement" of religion. *Id.*

Plaintiff does not assert that the challenged portions of the AmeriCorps EAP program either define its recipients by reference to religion or foster excessive governmental entanglement with religion. Consequently, the Court need only examine whether the challenged portions of the AmeriCorps EAP result in governmental indoctrination. To meet this criterion, Plaintiff must establish that (1) the government funding of the challenged portions of the AmeriCorps EAP constitutes indoctrination or results in it; and (2) that such indoctrination is attributable to the government. *See DeStefano,* 247 F.3d at 414 (citing *Agostini,* 521 U.S. at 226, 117 S.Ct. 1997).[11]

---

**11.** Plaintiff relies heavily in its briefs on *School Dist. of City of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) in support of this claim. However, the precedential value of that case was severely undercut by the Supreme Court's decision in *Agostini,* 521 U.S. at 222, 117 S.Ct. 1997, rejecting the three major assumptions on which *Ball* rested:

(i) any public employee who works on the premises of a religious school is presumed to inculcate religion in her work; (ii) the

## IV. Analysis

### A. The Government Funding of the Challenged Portions of the AmeriCorps EAP Results in Impermissible Government Indoctrination

To "indoctrinate" means "[t]o instruct in a body of doctrine or principles.... To imbue with a partisan or ideological point of view...." The American Heritage Dictionary of the English Language 984 (4th ed.2000). The Supreme Court uses "indoctrination" synonymously with "inculcation." *See Mitchell,* 530 U.S. at 858–59, 120 S.Ct. 2530 (O'Connor, J., concurrence); *Agostini,* 521 U.S. at 223–24, 117 S.Ct. 1997. To "inculcate" is "[t]o impress (something) upon the mind of another by frequent instruction or repetition; [to] instill." American Heritage Dictionary at 889 (also using "indoctrinate" as a synonym for "inculcate").

In *Mitchell,* the Supreme Court concluded that it is "inappropriate to presume inculcation of religion" by publicly funded teachers in religious schools. *Mitchell,* 530 U.S. at 858, 120 S.Ct. 2530 (O'Connor, J., concurrence). *See Agostini,* 521 U.S. at 223–24, 117 S.Ct. 1997 (plaintiff raising an Establishment Clause challenge must present evidence that the government aid in question has resulted in religious indoctrination); *Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 13, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) (rejecting presumption of indoctrination because it constitutes a "flat rule, smacking of antiquated notions of 'taint,' [that] would indeed exalt form over substance"). In the instant case, however, it is unnecessary to rely on any such presumption in order to conclude that

the teaching of religion by AmeriCorps participants in religious schools inculcates religion. This is because the parties do not deny that the faith-based AmeriCorps EAP grantees at issue in the instant case inculcate religion, primarily through the classroom work of their teachers. Thus, it is clear that the government funding of the challenged portions of the AmeriCorps EAP results in indoctrination.

The Establishment Clause, however, bars indoctrination only if it "could reasonably be attributed to governmental action." *Mitchell,* 530 U.S. at 809, 120 S.Ct. 2530 (Thomas, J., plurality). Accordingly, simply because a government-funded program engages in indoctrination does not mean that the program's funding is unconstitutional.

In distinguishing between indoctrination that is and is not attributable to governmental action, the Supreme Court has "consistently turned to the principle of neutrality, upholding aid that is offered to a broad range of groups or persons without regard to their religion." *Id.*

In its plurality opinion in *Mitchell,* the Supreme Court explained that "[i]f the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government." [12] *Id.* While Justice Thomas' plurality opinion emphasizes that the neutrality of aid criteria is the most important factor in considering the effect of a government aid program, *see Mitchell,* 530 U.S. at 809–10, 120 S.Ct. 2530, five Jus-

---

presence of public employees on private school premises creates a symbolic union between church and state; and (iii) any and all public aid that directly aids the educational function of religious schools impermissibly finances religious indoctrination,

even if the aid reaches such schools as a consequence of private decisionmaking.

12. Chief Justice Rehnquist and Justices Scalia and Kennedy joined Justice Thomas in the plurality opinion.

tices in *Mitchell* explicitly disagreed with Justice Thomas' discussion on this point. *See id.*, at 839, 120 S.Ct. 2530 (O'Connor, J., concurrence, joined by Breyer, J.) (neutrality "is by no means the only axiom in the history and precedent of the Establishment Clause") (internal citation omitted); *id.*, at 884, 120 S.Ct. 2530 (Souter, J., dissent, joined by Stevens, J. and Ginsburg, J.) (same). Under these circumstances, "Justice O'Connor's position on this issue … is [ ] the majority view of the Supreme Court."[13] *DeStefano,* 247 F.3d at 418. *See Gentala v. City of Tucson,* 244 F.3d 1065, 1076 (9th Cir.2001) (same); *Columbia Union College v. Oliver,* 254 F.3d 496, 504 (4th Cir.2001) (same). Therefore, while the neutrality of aid criteria is an important factor, it is "not alone sufficient to qualify the aid as constitutional." *Mitchell,* 530 U.S. at 840, 120 S.Ct. 2530 (O'Connor, J., concurrence).

In addition to "neutrality," the Supreme Court has "repeatedly considered whether any governmental aid that goes to a religious institution does so 'only as a result of the genuinely independent and private choices of individuals.' " *Id.*, at 810, 120 S.Ct. 2530 (Thomas, J., plurality) (quoting *Agostini,* 521 U.S. at 226, 117 S.Ct. 1997). *See Zelman v. Simmons–Harris,* 536 U.S. 639, 651, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (inquiry is "whether [aid] recipients generally [are] empowered to direct the aid to schools or institutions of their own choosing").

In *Mitchell,* the Supreme Court also held that the Establishment Clause "requires that aid to religious schools not be impermissibly religious in nature." *Mitchell,* 530 U.S. at 820, 120 S.Ct. 2530 (Thomas J., plurality). "So long as the

governmental aid is not itself 'unsuitable for use in the public schools because of its religious content,' and eligibility for aid is determined in a constitutionally permissible manner, any use of that aid to indoctrinate cannot be attributed to the government and is thus not of constitutional concern." *Id.*, at 820, 120 S.Ct. 2530 (Thomas J., plurality) (quoting *Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen,* 392 U.S. 236, 245, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (permitting the provision of secular textbooks the content of which had been approved by the public school authorities as appropriate for use in public schools)). *See Agostini,* 521 U.S. at 223–25, 117 S.Ct. 1997 (approving the use of public employees to teach secular remedial classes in private schools, in part, because there was no reason to suspect that religious indoctrination would be part of such governmental aid); *Zobrest,* 509 U.S. at 13, 113 S.Ct. 2462 (emphasizing the presence of private choice and the absence of government-provided sectarian content).

■ In sum, a government aid program does not result in impermissible governmental indoctrination if "it determines eligibility for aid neutrally, allocates that aid based on … private choice[ ] …, and does not provide aid that has an impermissible content." *Mitchell,* 530 U.S. at 829, 120 S.Ct. 2530 (Thomas, J., plurality).

**1. The Corporation does not determine eligibility for government aid neutrally**

■ It is clear from the record in the instant case that the Corporation does not offer aid "to a broad range of groups or persons without regard to their religion"

---

**13.** *See King v. Palmer,* 950 F.2d 771, 780 (D.C.Cir.1991) (" '[W]hen the Court issues fragmented opinions, the opinion of the Justices concurring in the judgment on the 'narrowest grounds' should be regarded as the Court's holding.' ") (quoting *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)).

and therefore does not determine eligibility for government aid neutrally. *Mitchell,* 530 U.S. at 809, 120 S.Ct. 2530 (Thomas, J., plurality).

First, the Corporation uses highly discretionary criteria—as opposed to fixed, objective, measurable criteria—to pick and choose among potentially qualifying AmeriCorps EAP grantees. For example, it assesses the extent to which the grantee applicant (1) "identifies a compelling need and describes how that need was identified," Oltmann Decl., ¶ 15; and (2) "[b]ring[s] together people of different backgrounds." Second Oltmann Decl., Ex. B, at 41.[14] In direct contrast, the government aid program upheld by the Supreme Court in *Zelman* distributed benefits to every family below a stated income level which lived in a designated geographic area. *See Zelman,* 536 U.S. at 646, 122 S.Ct. 2460. Similarly, the government aid program upheld by the Supreme Court in *Zobrest* distributed benefits "neutrally to any child qualifying as 'disabled' under the [statute]. . . ." *Zobrest,* 509 U.S. at 9, 113 S.Ct. 2462. *See Mueller v. Allen,* 463 U.S. 388, 398, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (the challenged law "permits *all* parents . . . to deduct their children's educational expenses") (emphasis in original).

Second, a number of programs openly require that AmeriCorps participants be of a particular faith. For example, a recent search of the CNVS online "Response Directory" revealed programs such as the Pacific Alliance for Catholic Education, which listed among its requirements that participants "[m]ust be Catholic," *id.,* at 21, 113 S.Ct. 2462; the Franciscan Volunteer Ministry, which listed among its requirements that participants are required

to be "[d]ependable and flexible Christian men and women," *id.;* and Red Cloud Volunteers, which listed among its requirements that participants are required to be "Christian." *Id.*

Thus, given the record in the instant case which shows not only that the Corporation uses highly discretionary criteria to select among potentially qualifying grantees, but also that a number of programs actually list among their requirements that AmeriCorps participants must be of a particular faith, it is clear that the Corporation does not determine eligibility for government aid neutrally.

### 2. The AmeriCorps EAP is not a program of "true private choice"

In addition to "neutrality," the Supreme Court has "repeatedly considered whether any governmental aid that goes to a religious institution does so 'only as a result of the genuinely independent and private choices of individuals.'" *Mitchell,* 530 U.S. at 810, 120 S.Ct. 2530 (Thomas J., plurality) (quoting *Agostini,* 521 U.S. at 226, 117 S.Ct. 1997).

The Corporation maintains that the AmeriCorps EAP is analogous to other "private choice" programs upheld by the Supreme Court because here, "individual participants choose where to use the government benefits at issue." Def.'s Mot., at 26. Specifically, it argues that it is the AmeriCorps participants—not the government—who, through their choice of placement, determine which programs receive Corporation funds; the funds, the Corporation claims, follow the AmeriCorps participant.

---

14. The fact that there are substantial inconsistencies between the selection criteria as outlined in the 2004 AmeriCorps Guidelines and the selection criteria as explained by Oltmann in his Declaration illustrates the extent of discretion the Corporation enjoys in the grantee selection process.

However, the record demonstrates clearly that the AmeriCorps EAP is not a program of "true private choice." As a matter of Corporation policy, AmeriCorps participants may enroll only in programs that the Corporation has pre-approved. Thus, participants are not free to choose the program for which they will receive government funding.

The Corporation also argues that the AmeriCorps EAP is similar to the private choice programs upheld by the Supreme Court in *Mueller* (permitting tax deductions for various educational expenses, including private school tuition); in *Witters v. Washington Dep't of Servs. For the Blind*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (offering vocational education scholarship to visually disabled seminarian not unconstitutional); in *Zobrest* (providing a sign language interpreter for deaf child in religious secondary school not unconstitutional); and in *Zelman* (allowing the state to provide vouchers to poor elementary and secondary school students to attend any public or private school). The cases cited by the Corporation are distinguishable for two reasons.

First, in the cases cited, the private individual had the statutory right to apply the government funding to any school program of his or her liking; in this way, the government aid was virtually an entitlement. In contrast, in the instant case, the AmeriCorps participants have no such free choice of placement because, as a matter of Corporation policy, AmeriCorps participants may enroll only in programs that it has pre-approved. Second, in the instant case, the grantees actively recruit and select AmeriCorps participants and a number of grantee programs actually list among their requirements that AmeriCorps participants must be of a particular faith.[15]

Thus, given the record in the instant case which shows that Corporation policy limits enrollment of AmeriCorps participants to programs that the Corporation has pre-approved, as well as that a number of programs actually list among their requirements that AmeriCorps participants must be of a particular faith, it is clear that the AmeriCorps EAP is not a program of "true private choice."

### 3. The AmeriCorps educational awards being challenged have an impermissible content

In *Mitchell*, the Supreme Court held that the Establishment Clause "requires that aid to religious schools not be impermissibly religious in nature." *Mitchell*, 530 U.S. at 820, 120 S.Ct. 2530 (Thomas J., plurality). It is clear from the record in the instant case that the $4,725 AmeriCorps education awards being challenged are in fact impermissibly religious in their nature and content.

The Corporation defends the operation of its EAP on the ground that its time-keeping policies are sufficient to ensure that the religious instruction undertaken by AmeriCorps participants during the school day is separate from their AmeriCorps service, and therefore the government aid in question does not have any impermissible content. Specifically, the Corporation maintains that its timekeeping policies ensure that the AmeriCorps participants are not given service hour credit toward their education award for the time

---

**15.** Grantees are responsible for recruiting and selecting AmeriCorps EAP participants for their individual programs. *See* Second Oltmann Decl., Ex. B, at 16. In fact, a key performance measure is the grantee's ability to enroll the number of full-time and less than full-time members agreed upon in its approved application. *See id.*

they spend in religious activity. This argument must be rejected for two reasons.

First, the Corporation's monitoring efforts are totally inadequate to ensure that its timekeeping policies are followed. In *Bowen v. Kendrick,* 487 U.S. 589, 615, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), the Supreme Court recognized the necessity and importance of an agency monitoring its grants. *See Agostini,* 521 U.S. at 234–35, 117 S.Ct. 1997 (upholding government aid program in part because it contained appropriate "safeguards"); *Mitchell,* 530 U.S. at 861, 120 S.Ct. 2530 (O'Connor, J., concurrence) (reviewing the monitoring mechanisms in place and concluding that "[t]he safeguards employed by the program are constitutionally sufficient").

The Corporation's monitoring efforts are clearly insufficient when measured against the programs at issue in the Supreme Court's recent cases. In *Agostini,* the Supreme Court found that the government aid program at issue employed appropriate "safeguards" where "a publicly employed field supervisor was to attempt to make *at least one unannounced visit to each teacher's classroom every month." Agostini,* 521 U.S. at 212, 117 S.Ct. 1997 (emphasis added). In *Mitchell,* the state, among other monitoring measures, conducted *"annual monitoring visits to each of the nonpublic schools* receiving Chapter 2 aid." *Mitchell,* 530 U.S. at 862, 120 S.Ct. 2530 (O'Connor, J., concurrence) (emphasis added).

In contrast, in the instant case, the Corporation conducts only a handful of pre-announced site visits each year to religious schools in which AmeriCorps participants are serving as teachers. Moreover, as Plaintiff correctly points out, "even these infrequent, pre-announced site visits have revealed what one Corporation official has described as 'serious' infractions of the Corporation's policies." [16] Pl.'s Opp'n, at 21.

Second, even if the Court assumes that the Corporation accurately estimates the time AmeriCorps participants spend on religious versus non-religious activities, it is not possible to clearly distinguish between the two roles the AmeriCorps participants supposedly play. AmeriCorps participants placed as teachers in religious schools teach religion throughout the school day, lead their students in prayer multiple times a day, and attend Mass with their students. In addition, one of the factors ACE uses in evaluating its AmeriCorps teachers is whether the teacher "provides a variety of prayer experiences" and "witnesses as a person of faith and prayer." Pl.'s Statement of Facts, ¶ 44. In short, the record makes clear that there is a total blurring of religious and non-religious activities.

It is also significant that the Corporation "expects" that its "Education Awards Programs and members take specific action to create an identity that includes AmeriCorps symbols and networks." Pl.'s Ex. A–2, at C 3347. Indeed, the concept of "AmeriCorps Identity," i.e., "the extent to which the provision of AmeriCorps funding is outwardly evident at the site," is one of the specific items that Corporation person-

---

**16.** The Corporation maintains that "day-to-day monitoring of the AmeriCorps participants' timekeeping is more appropriately left to the grantees, which supervise and have direct knowledge of the particular activities of a host site—and not to the Corporation." Def.'s Opp'n, at 32. The Corporation also contends that the problems which Plaintiff points to "are *de minimis*—isolated instances by private parties who misunderstand the program's rules prohibiting any religious activities within the scope of AmeriCorps hours." *Id.,* at 33. Given the record in the instant case, these arguments are not persuasive.

nel look for when they conduct site visits at religious schools. Oltmann Decl., ¶ 52. Corporation personnel are also asked to inquire whether the program in question "identif[ies] itself, and . . . the members identify themselves, with AmeriCorps, through the use of signs, T-shirts, sweatshirts, banners, logos that incorporate the A*C logo." Pl.'s Ex. A–2, at C 3347.

It is well established that "[a] school which operates to commingle religion with other instruction plainly cannot completely secularize its instruction." *Lemon*, 403 U.S. at 636–37, 91 S.Ct. 2105. *See Ball*, 473 U.S. at 384, 105 S.Ct. 3216 (citing *Meek v. Pittenger*, 421 U.S. 349, 356, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), *overruled on other grounds*, ("The very purpose of many of those [religious] schools is to provide an integrated secular and religious education"), *Walz v. Tax Comm'n*, 397 U.S. 664, 671, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) ("to assure future adherents to a particular faith" is "an affirmative if not dominant policy of church schools"), *Lemon*, 403 U.S. at 657, 91 S.Ct. 2105 ("[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within that

institution, the two are inextricably intertwined.")).

Thus, it is clear from the record in the instant case that the Corporation's monitoring efforts are not adequate to ensure that its timekeeping policies are followed, and thus that the government aid in question does not have an impermissible content. Moreover, even if the Court assumed that the Corporation could accurately estimate the time AmeriCorps participants spend on religious versus nonreligious matters, it is not possible to clearly distinguish between the two roles the AmeriCorps participants are supposed to play.[17]

### B. The Monetary Grants that the Corporation Provides Directly to Faith–Based AmeriCorps EAP Grantees Are Unconstitutional

■■ The standard for evaluating the constitutionality of direct monetary aid announced in *Comm. For Public Educ. v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) is controlling in the instant case.[18] In *Nyquist*, the Supreme Court held that "[i]n the absence of an effective means of guaranteeing that the [government] aid derived from public

---

17. The Corporation maintains that "Supreme Court precedent has established that the mere presence of AmeriCorps participants in religious schools does not result in governmental indoctrination, any more than such indoctrination occurs because of the presence, in religious schools, of public school teachers (upheld in *Agostini*) or government-loaned instructional equipment (upheld in *Mitchell*)." Def.'s Opp'n, at 16. This argument is unconvincing because in the cases cited by the Corporation, the Supreme Court found no establishment clause violation where public support was provided for specifically identified secular Title I services, *see Agostini*, 521 U.S. at 211, 117 S.Ct. 1997, or educational materials and equipment, *see Mitchell*, 530 U.S. at 801, 120 S.Ct. 2530 (Thomas, J., plurality). In contrast, in the instant case, the

Corporation chooses to fund faith-based grantees. This distinguishes the instant case from those in which the government sponsored supplementary educational aids that were inherently secular, but allowed their recipients to divert the funds to purchase that supplementary aid for sectarian purposes.

18. In *Zelman*, the Supreme Court expressly held that "*Nyquist* does not govern neutral educational assistance programs that . . . offer aid directly to a broad class of individuals defined without regard to religion." *Zelman*, 536 U.S. at 641, 122 S.Ct. 2460. As discussed *supra*, the Corporation does not determine eligibility for government aid neutrally. Accordingly, the instant case fits squarely within the category of cases governed by *Nyquist*.

funds will be used *exclusively* for secular, neutral, and nonideological purposes, ... direct aid in whatever form is invalid." *Nyquist*, 413 U.S. at 780, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (emphasis added).

Under *Nyquist*, the $400 grants that the Corporation provides directly to faith-based AmeriCorps EAP grantees are unconstitutional.[19] It is undisputed that the Corporation "does not require grantees to account for the uses of these funds" because it claims that the secular administrative costs of the AmeriCorps EAP are "expected" to exceed the amount of the grant, thus ensuring that the grant is expended entirely on secular activities. Oltmann Decl., ¶ 12. In support of this argument, the Corporation points out that "the grantees referred to in the complaint affirmatively attest that no portion of the [ ] grants is used for religious activities." Def.'s Opp'n, at 42.

The Corporation's "expectation" that the grantees will spend the direct monetary grants on secular administrative costs—without actually requiring any segregation or accounting for the use of the grants—is not sufficient to render the grants constitutional. *See Nyquist*, 413 U.S. at 778, 93 S.Ct. 2955, 37 L.Ed.2d 948 ("a mere statistical judgment will not suffice as a guarantee that state funds will not be used to finance religious education").

Thus, the direct $400 grant that the Corporation provides directly to faith-based AmeriCorps EAP grantees for each AmeriCorps participant is unconstitutional because it is clear from the record that the Corporation requires no segregation or accounting for the use of those funds so as to ensure that the money is spent only on secular activities.[20]

## C. The Court's Decision to Grant Plaintiff's Motion Does Not Require AmeriCorps Participants to Surrender Their First Amendment Rights

■ The Corporation argues that sustaining Plaintiff's challenge in the instant

---

**19.** The Corporation argues that because "these payments are based on the number of AmeriCorps participants enrolled with the grantee, and depend entirely upon the choice of the individual participants to serve through that organization," "[r]ather than 'direct aid,' [ ] the [ ] grants are similar to the 'private-choice' programs upheld by the Supreme Court." Def.'s Opp'n, at 43. This argument is not supported by Supreme Court case law. These grants are "direct aid" rather than the result of "private choice" because the grants are paid directly to the faith-based grantees rather than through an intermediary. *See Mitchell*, 530 U.S. at 842–43, 120 S.Ct. 2530 (O'Connor, J., concurrence) ("a government program of direct aid to religious schools based on the number of students attending each school differs meaningfully from the government distributing aid directly to individual students who, in turn, decide to use the aid at the same religious schools").

**20.** The Corporation cites to *Roemer v. Bd. of Pub. Works of Md.*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) and *Comm. for Public Educ. and Religious Liberty v. Regan*, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980) in support of its claim that the $400 grants that it provides directly to faith-based AmeriCorps EAP grantees are constitutional. *Roemer*, which approved segregated funds after finding recipients not pervasively religious, is inapposite and *Regan* is distinguishable. In *Regan*, the Court upheld a New York statute which authorized the use of public funds to reimburse religious schools for performing various testing and reporting services mandated by state law partly because the challenged statute "provide[d] ample safeguards against excessive or misdirected reimbursement." *Regan*, 444 U.S. at 659, 100 S.Ct. 840. In the instant case, as discussed *supra*, the Corporation's monitoring efforts are not sufficient to ensure that the Corporation's timekeeping policies are followed, and thus that the government aid in question does not have an impermissible content.

 

case would require AmeriCorps participants to "surrender their constitutionally protected rights to engage in certain religious exercise and speech activities on their own time." Def.'s Opp'n, at 2. This argument is totally without merit and borders on the disingenuous. It is clear from both Plaintiff's briefs and its representations at oral argument that Plaintiff is not asking the Court to restrict in any way the truly private religious activity and speech of AmeriCorps participants. It is also clear that the Court's decision to grant Plaintiff's Motion "does not require [AmeriCorps participants] to choose between their religious beliefs and receiving a government benefit." *Locke v. Davey,* 540 U.S. 712, 124 S.Ct. 1307, 1312–13, 158 L.Ed.2d 1 (2004) (holding that Washington State's restriction on the use of a state scholarship to pursue a theological degree did not violate the free exercise clause of the First Amendment). AmeriCorps participants placed as teachers in religious schools are free to attend any religious service and observe any religious tradition on their own time, i.e., outside of and separate from their AmeriCorps teaching assignments. Thus, the Court's decision to grant Plaintiff's Motion does not require AmeriCorps participants to surrender their First Amendment rights.

## V. CONCLUSION

For the reasons stated, Plaintiff's Motion is **granted,** the Corporation's Motion is **denied,** and Notre Dame's Motion is **denied.**

An Order will issue with this opinion.

### ORDER

Plaintiff, the American Jewish Congress, brings this action against the Corporation for National and Community Service ("Corporation"). The University of Notre Dame ("Notre Dame") is a Defendant–Intervenor. This matter is now before the Court on three Motions for Summary Judgment filed by Plaintiff, the Corporation, and Notre Dame. Upon consideration of the Motions, Oppositions, Replies, the June 2, 2004 Motions Hearing, and the entire record herein, and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiff's Motion for Summary Judgment [# 42] is **granted**; it is further

**ORDERED** that the Corporation's Motion for Summary Judgment [# 44] is **denied**; it is further

**ORDERED** that Notre Dame's Motion for Summary Judgment [# 45] is **denied.**